Francis J. "Casey" Flynn, Jr., SBN 304712
LAW OFFICE OF FRANCIS J. FLYNN, JR.
5067 Metropolitan Plz.
Los Angeles, California 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

Michael J. Flannery (Cal. Bar No. 196266)
CUNEO GILBERT & LADUCA, LLP
Two CityPlace Drive, Second Floor
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Marco Cercone (admitted *pro hac vice*)
RUPP PFALZGRAF LLC
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel: (716) 854-3400
cercone@rupppfalzgraf.com

*Counsel for Plaintiff and the Proposed Class*
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MACK'S JUNK REMOVAL, LLC, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>           vs.<br><br>ROUSE SERVICES LLC;  RB GLOBAL, INC.; UNITED RENTALS, INC.; SUNBELT RENTALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT | Case No.      2:25-cv-03565-MRA-SK<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF:** |

| | | |
|---|---|---|
| 1 | SERVICES, INC., SUNSTATE EQUIPMENT CO., LLC; THE HOME DEPOT, INC.; and EQUIPMENTSHARE.COM INC., | **(1) VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE (HUB AND SPOKE CONSPIRACY), 15 U.S.C. §1** |

1
2
3
4

Defendants.

5
6
7
8
9
10
11
12
13
14

**(1) VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE (HUB AND SPOKE CONSPIRACY), 15 U.S.C. §1**

**(2) VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE (SET OF VERTICAL AGREEMENTS), 15 U.S.C. § 1;**

**(3) VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION, 15 U.S.C. § 1**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ........................................................................... 1

II.   PARTIES AND UNNAMED CO-CONSPIRATORS ................................... 7

III.  JURISDICTION AND VENUE .................................................................. 13

IV.   FACTUAL BACKGROUND ...................................................................... 14

    A. Rouse Rental Insights is Widely Used to Set Equipment Rental Prices in
    The Construction Equipment Rental Industry. ......................................... 14

    B. Rouse Service and the Equipment Rental Company Defendants
    Conspired to Eliminate Competition by Outsourcing Independent Pricing
    Decisions to Rouse Rental Insight. ........................................................... 17

    C. Rouse Service Collects Extensive Data From Construction Equipment
    Rental Companies to Facilitate Sharing Of CSI And Enforcing The
    "Benchmark" Prices ................................................................................. 26

    D. Defendants' Conduct Has No Pro-Competitive Benefits And Only
    Benefitted Themselves ............................................................................. 28

    E. Studies Show That Industry-Wide Usage of a Shared Pricing Algorithm
    Leads to Anticompetitive Effects. ............................................................ 33

    F. Parallel Conduct And "Plus Factors" Indicate an Existence of a Price-
    Fixing Conspiracy. ................................................................................... 37

        1.    Exchange of Competitive Sensitive Information ...................... 38

        2.    Actions Against Economic Self-Interest ................................... 39

        3.    High Barriers to Entry .............................................................. 41

        4.    High Switching Cost ................................................................. 42

        5.    Relative Fungible Products Subject to Inelastic Consumer
        Demand ...................................................................................... 42

        6.    Market Concentration ............................................................... 42

        7.    Ample Opportunities to Collude ............................................... 43

V.    RELEVANT MARKET .............................................................................. 43

VI.    DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET .....45

VII.   ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE
       COMMERCE ..................................................................................46

VIII.  CLASS ACTION ALLEGATIONS ...............................................47

IX.    CAUSES OF ACTION ....................................................................49

X.     PETITION FOR RELIEF................................................................55

XI.    JURY DEMAND ............................................................................56

Plaintiff Mack's Junk Removal, LLC brings this action on behalf of itself individually and on behalf of a class consisting of all persons and entities who rented construction equipment directly from a defendant or co-conspirator from March 31, 2021 through the present, in the nationwide construction equipment rental market. Plaintiff brings this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiff demands a trial by jury.

## I.  NATURE OF THE ACTION

1.      The U.S. construction industry has experienced a significant rise in the cost of renting construction equipment. This increased cost is primarily tracked by the Producer Price Index (PPI) for construction equipment rental and leasing,[1] which shows a generally upward trajectory for the past decade. Notably, in 2022 and 2023, the PPI for construction equipment rental saw annual increases exceeding five percent. This increased cost has been borne directly by the plaintiff and the class members it seeks to represent in this action. Plaintiff and the class members paid an artificially inflated price for the equipment they rent but for the Defendants' anticompetitive conduct.

2.      The artificially high rental price for construction equipment is a direct result of Defendants' anticompetitive conduct. Specifically, the Equipment Rental Company Defendants[2] have been using Rouse Service LLC (hereinafter, "Rouse

---

[1] https://fred.stlouisfed.org/series/PCU5324125324121?utm_source=chatgpt.com

[2] Defendants, Sunbelt Rentals, Inc., Herc Rentals Inc., Herc Holdings Inc., H&E Equipment, Services, Inc., Sunstate Equipment Co., LLC, Equipment Share and The Home Depot, Inc. are the "Equipment Rental Company Defendants," and together with RB Global, Inc. and Rouse Services LLC, the "Defendants."

Service")[3] to coordinate their equipment rental pricing and inflate or maintain their equipment rental rates at artificially high level to maximize their profits.

3.    The Equipment Rental Company Defendants supply construction equipment rentals to individuals, small local contractors, larger companies, municipalities and government entities, among others. They provide a wide variety of rental equipment including mid-size and heavy equipment, specialty equipment and contractor tools.

4.    In a competitive market, the Equipment Rental Company Defendants would set their rates in accordance with the fundamentals of supply and demand. In the absence of knowledge about competitors' pricing strategies, the Equipment Rental Company Defendants can only make their best educated guesses and set their prices at optimal positions, usually a bit lower than what is offered by competitors— to attract customers in the market. If a company wants to take a chance to raise prices regardless of market conditions, other competitors will soon take that company's business away.

5.    Together with Rouse Service, the Equipment Rental Company Defendants no longer need to live with the uncertainty of setting prices to compete against one another. The Equipment Rental Company Defendants opted to outsource their once independent pricing and supply decisions to a single decision maker— Rouse Service, with which they jointly implemented and enforced a coordinated pricing strategy unlawfully. Plaintiff challenges this conspiracy among the

[3] Rouse Services LLC is a subsidiary of RB Global, Inc. and Rouse Services LLC are the "Rouse Defendants."

Defendants that has led to artificially inflated prices for construction equipment rentals that it and other class members paid across the United States.

6.      The conspiracy enabled the Equipment Rental Company Defendants to implement a distinctive and unprecedented shift in the pricing and utilization strategies in the construction equipment rental industry. In the words of a former CEO of a large construction equipment rental company that was acquired by Defendant Sunbelt, the industry has become "much more disciplined" on pricing, "knowing that going to the lowest price was not the best strategy," because everyone "used Rouse." There is no more need for a race to the bottom competition because "Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices." During a Bank of America conference in May 2023, HERC CEO Lawernce Silber emphasized that Rouse Analytics is a "key tool that we use to help us price in the market place," which allows the company to maintain prices at higher levels.

7.      Rouse Service is ubiquitous in the construction equipment rental industry. According to International Rental News, at least 85% of the revenue generated by North America's 35 largest rental firms came from Rouse Service's customers. Rouse Service collects "actual rental invoices and daily fleet snapshots from over 400 companies across North America." These data represents "over $115 billion of fleet on a cost basis and $49 billion of rental revenue to provide clients

with comparisons of the rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."[4]

8.      According to investigations and reports done by The Capitol Forum, a subscriber-based investigative news organization and industry watchdog, equipment rental companies must agree to share their competitively sensitive information ("CSI") to use Rouse Service. According to a slide deck used by Rouse Service for marketing purposes, clients can access detailed sales output data of nearby competitors through Rouse Service's analytic program. Clients can also see how their equipment "utilization" and rental rates stack up against local averages.

9.      According to Rouse Service's website, it "pull[s] data directly from [] clients' systems to ensure our rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates." Rouse Service advertises its algorithmic pricing tools and "benchmarking" services to construction equipment rental companies as a means of increasing prices above those available in a competitive market and avoiding the risk of relying "solely on limited data and anecdotal information" and salespeople in making rental-rate and fleet utilization decisions.

10.     The sharing of CSI through Rouse Service enabled the Equipment Rental Company Defendants and their co-conspirators to compare their rates in the local, regional and national marketplaces. The need to guess or direct disclosure of pricing strategies is no longer necessary. Based on the Capital Forum's

---

[4]https://www.rouseservices.com/solutions/rental-insights/#:~:text=Rouse%20uses%20actual%20rental%20invoices,each%20market%20%20they%20operate%20in.

investigation, sales personnel at equipment rental companies who use Rouse Rental Insights to run their daily businesses understand that Rouse Service is never used for lowering their rental rates to gain a competitive advantage in the market. Instead, the understanding among sales personnel has been to utilize Rouse Service to collectively push for higher prices and maximize profits regardless of the supply and demand rule and the fairness of competition.

11. The Equipment Rental Company Defendants and their co-conspirators shared CSI against their self-interest but for the existence of a conspiracy. Through the Rouse Defendants, the Equipment Rental Company Defendants were able to sacrifice output for profit and avoid a "race to the bottom" competition. As explained in an interview by an equipment rental CEO whose previous company was acquired by Sunbelt, the rental companies "were willing, at least in the short term, to endure lower time utilization rather than go too low on dollar utilization."[5]

12. Defendants understand that the CSI provided to Rouse Service is used to reinforce the supracompetitive pricing adjustments. Rouse Service regularly announced how many rental companies were part of its scheme and pitched its product to rental companies by emphasizing to them that competitors "around you are using us, [so] you should use us [too]." As new clients joined, they accepted the advertised invitation to trade their CSI for the ability to charge increased rental rates without fear of being undercut by their competitors and deprioritized high utilization in favor of collective pricing.

---

[5] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition

13.     Rouse Service's business practice is similar to those of RealPage and
Agri Stats, two benchmarking providers that are facing antitrust lawsuits from the
Department of Justice. As reported by The Capitol Forum, a former DOJ lawyer
commented that, Rouse Service's 2024 marketing material suggested a price
coordination that is "remarkably similar to the conduct that led to the RealPage and
Agri Stats suits."



*The "Equipment" tab of a customer's Rouse Rental Insights dashboard*

14.     The DOJ has filed several statements of interest in private litigation and
withdrawn its previous policy guidance for collaboration among competitors.[6] As
stated by Doha Mekki, then-deputy assistant attorney general for the DOJ antitrust
division, "the suggestion that data that is at least three-months old is unlikely to be
competitively sensitive or valuable is undermined by the rise of data aggregation,
machine learning, and pricing algorithms that can increase the competitive value of
historical data for some products or services. To use an analogy, maintaining the

---

[6]https://www.ftc.gov/system/files/ftc_gov/pdf/v250000collaborationguidelineswith
drawalstatement.pdf

safety zones would be like developing specifications for audio cassette tapes and applying them to digital streaming."[7]

15.    Defendants' conspiracy has benefited themselves, who are reporting record profits in recent years, to the detriment of Plaintiff and other renters of construction equipment. Defendants have violated and continue to violate U.S. antitrust laws. Instead of setting their rental rates independently, the Equipment Rental Company Defendants, who control much of the nation's construction equipment rental market, outsource rate-setting to a common entity—Rouse Service. By acting collectively through Rouse Service, the Equipment Rental Company Defendants and their co-conspirators eliminate competition among themselves.

16.    Plaintiff brings this action to recover damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of itself and all others similarly situated.

## II. PARTIES AND UNNAMED CO-CONSPIRATORS

17.    Plaintiff Mack's Junk Removal, LLC ("Mack's Junk Removal" or "Plaintiff") is a New York limited liability company with a principal place of business at 93 Sibley Drive, West Seneca, NY 14224. Mack's Junk Removal brings over 15 years of experience in junk removal, demolition, and pressure washing services to Buffalo and the surrounding areas. During the Class Period, Plaintiff rented construction equipment directly from one or more of the Defendants. As a

---

[7] https://www.justice.gov/archives/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0

result of Defendants' anticompetitive conduct, Plaintiff paid artificially inflated prices for the equipment it rented from one or more of the Defendants.

18.    Defendant RB Global, Inc. ("RB Global") is a public company, traded on the Toronto and New York Stock Exchanges, that is legally domiciled in Canada with headquarters at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154. It describes itself as  "a leading global marketplace that provides value-added insights, services, and transaction solutions for buyers and sellers of commercial assets and vehicles worldwide." In 2022, the company reported $6 billion in Gross Transactional Value. Ritchie Bros. has moved from being strictly an auction company to a solutions, insights, and services company.

19.    Defendant Rouse Services LLC ("Rouse Service") is a wholly owned subsidiary of RB Global, and is headquartered at 8383 Wilshire Boulevard, Suite 900l, Beverly Hills, California 90211. RB Global acquired Rouse in 2020 for $275 million. Rouse Service is "the leading provider" of "construction equipment market intelligence" and "rental metrics benchmarks, and construction equipment valuations to lenders, rental companies, contractors and dealers." Its "business model is built upon an extensive data ecosystem, proprietary analytics, data science techniques, and trusted consumer relationships rooted in service and confidentiality" and "provides complete end-to-end asset management, data-driven intelligence, and performance benchmarking system." It "provides Cat-Class level comparisons of rental rates, utilization, and other key performance metrics" for equipment rental companies. On its website, it is marketed as "the gold standard for appraisals, used equipment sales support, and rental metrics benchmarking for customers throughout the United States, Canada, the United Kingdom and Australia."

20.    Defendant United Rentals, Inc. ("United Rentals") is a public company incorporated in Delaware with its principal place of business at 100 First Stamford Place, Suite 700, Stamford, CT 06902.

21.    United Rentals leads the market with an estimated 16% share (as of 2023)8, making it the largest equipment rental company in the country, with over 1,400 retail locations across North America.

22.    United Rentals has enjoyed record-setting profits year after year. For the full year 2024, United Rentals reported total revenue of $15.345 billion, a 7.1% increase from 2023. In 2024, the company also achieved an annual gross profit of $6.15 billion, marking a 5.8% increase from $5.813 billion in 2023. The chart below



shows United Rental's profit growth from 12/31/2009 to 01/01/2025 in billions:

23.    Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is incorporated in North  Carolina and maintains its principal place of business at 1799 Innovation Point, Fort Mill, North Carolina 29715. As the country's second largest equipment

_____

8 https://www.khl.com/news/leading-the-world-in-growth-top-15-us-based-rental-companies/8032165.article?utm_source=chatgpt.com

rental company, Sunbelt Rentals has 1,186 locations in the U.S. and offers over 14,000 types of equipment for rent.

24.     Sunbelt Rentals is publicly traded on the London Stock Exchange under the name Ashtead Group. Ashtead does business in Canada and the United Kingdom as well. In 2024, Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business alone. Its U.S. fleet is worth over $15 billion.

25.     Defendants HERC Rentals Inc. and HERC Holdings Inc. (together, "HERC Rentals" or "HERC") are public companies incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. The majority of HERC Rentals' business is in equipment rental, but the company also engages in sales of used rental equipment and new equipment, parts, and supplies.

26.     HERC Rentals has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost of $7 billion. In 2023, HERC Rentals reported a total revenue of $3.3 billion. Its revenue from equipment rental had grown 46% from 2021. And in 2024, its total revenue again jumped, to a record $3.6 billion.

27.     Defendant H&E Equipment Services, Inc. ("H&E") is a publicly traded company incorporated in Delaware with its principal place of business at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E is over sixty years old and concentrates its business on four categories of rentals: (1) hi-lift or aerial work platform equipment; (2) cranes; (3) earthmoving equipment; and (4) industrial lift trucks. The company provides rental, sales, parts, repair and maintenance functions for these equipment categories.

28.    H&E has 160 locations across the U.S. As of December 31, 2024, H&E owned 63,630 pieces of equipment with an original acquisition cost of approximately $2.9 billion. In 2023, H&E reported a revenue of $1.47 billion, with equipment rentals making up over half of its gross profit.

29.    Defendant Sunstate Equipment Co., LLC ("Sunstate") is incorporated in Delaware and has its principal place of business at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is a wholly owned company of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

30.    Founded in 1977, Sunstate is now among the largest rental equipment companies in the U.S. The company has approximately 100 branches in sixteen states. Like the other Defendants, Sunstate has made a series of acquisitions of other rental companies over the years, and its profits and revenues have grown over time.

31.    Defendant EquipmentShare.com Inc. ("EquipmentShare") was founded in 2015. It is incorporated in Delaware and maintains its principal place of business at 5710 Bull Run Drive, Columbia, Missouri 65201. It operates over 300 equipment rental, retail and service locations across 43 states and is among the fastest-growing companies in the industry, with a valuation exceeding $2 billion. Though privately held, it is estimated to hold around 2–3% of the U.S. rental market.

32.    Defendant Home Depot, Inc. ("Home Depot") is a public company incorporated in Delaware with its principal place of business in Atlanta, Georgia. Home Depot provides tool and equipment rental and home improvement installation services. In addition, Home Depot is the world's largest home improvement retailer and sells a wide range of building materials, home improvement products, lawn and

garden products, décor products, and facilities maintenance, repair and operations products. As of 2023, Home Depot operated 2,335 stores located throughout the U.S. and its territories (including the Commonwealth of Puerto Rico and the territories of the U.S. Virgin Islands and Guam), Canada, and Mexico.

33.    Various co-conspirators also participated in the Rouse Cartel with Defendants. The co-conspirators are persons and entities, including rental equipment companies and other industry participants, known and unknown to Plaintiff at this time and not named as defendants in this action. They have participated as co-conspirators with Defendants in the offenses alleged and have performed acts and made statements in furtherance of the Cartel.

34.    Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction or control of Defendants' business or affairs.

35.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

36.    When Plaintiff refers to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families.

37.     As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

38.     Each of the Defendants acted as the agent of, co-conspirator with, or joint venture partner of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint. Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent when agreeing to use Rouse Service in the United States.

### III.    JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

40.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

41.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in this state, including through the rental of construction equipment products.

42.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of construction equipment products.

43.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and

are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.    FACTUAL BACKGROUND

### A.    Rouse Rental Insights is Widely Used to Set Equipment Rental Prices in The Construction Equipment Rental Industry.

44.    Rouse Service was founded in 1920 when Max Rouse opened an auction and liquidation firm for construction equipment after World War I. For the first 80 years of its corporate history, Rouse was an auctioneer for construction equipment.

45.    In the late 1990s, Ritchie Brothers, a Canadian company, entered the U.S. construction equipment auction market. Rouse Service decided in or around 2000 to get out of the auction business, which had become saturated, and become an information services company, with a focus on construction equipment appraisals and fleet valuations. Through its work in the appraisal and fleet valuation space, Rouse Service began to build a database of equipment prices for sales of used construction equipment. Some of Rouse Service's customers in this space included construction equipment rental companies.

46.    In approximately 2008 and 2009, several of Rouse Service's rental company clients—including Defendants HERC, Sunbelt Rentals, and United Rentals—approached Rouse Service, asking the company to create a service for a new market sector: construction equipment rentals.

47.    In 2010, an industry leader and former HERC President published a piece in the industry-facing publication, the Rental Equipment Register, titled "The Clock Is Ticking on Rate Discipline." He asserted that rental companies were

engaged in aggressive competition resulting in a race to the bottom. He wrote, "[T]he entire industry must accept rate responsibility together."

48.    In response to this article, another industry leader agreed that a lack of price "discipline" and aggressive competition were hurting the industry as a whole, stating that "continually slashing rates and using rate discounting as a method to sell your business means selling the industry short."

49.    In 2011, the American Rental Association ("ARA")[9] in collaboration with Rouse Service and other major rental companies—standardized metrics for the industry, namely, the ARA Rental Market Metrics.[10] These metrics codified, for the first time, industry standards for such measurements as physical utilization, dollar utilization, and fleet age. The metrics were developed so that competitors in the market can "compare themselves to other companies based on the ARA Rental Market Metrics[TM] standards."[11] In particular, these metrics provide invaluable insights for competitors to understand "rental rates, physical utilization, dollar utilization, fleet age, and revenue per day metrics" of other competitors in the market.

50.    Just one month after the ARA Rental Market Metrics went live, industry giants United Rentals, Hertz Equipment Rental Corporation (now Herc

_____

[9] The American Rental Association is a trade association "for owners of equipment rental businesses and the manufacturers and suppliers of construction/industrial, general tool and party/event rental equipment."

[10] https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants

[11] https://web.archive.org/web/20161207180032/https://www.businesswire.com/news/home/20111024005980/en/Rouse-Analytics-Launches-Rental-Metrics-Benchmark-Service

Rentals)[12], H&E Equipment Services, NES Rentals (acquired by United Rentals), and Neff Corp (acquired by United Rentals) founded Rouse Rental Insights, Rouse Service, LLC's online analytic platform. This flatform enables competitors to "[g]et price and utilization benchmark data quickly and easily." Rouse Service touts that this platform "provides you with instant access to comprehensive benchmark data by market and Cat Class" and helps clients "make critical purchasing, sale, and pricing decisions every day that affect your profitability."[13] This platform marks the beginning of a common system that could be used to compare and align construction equipment rental prices for Defendants.

51.    In December 2020, Ritchie Brothers, a global leader in the sales of heavy equipment, acquired Rouse Service. Joining Ritchie Brothers allowed Rouse Service to integrate its advanced data analytics capabilities into Ritchie Brothers' existing data services and thereby supercharge its algorithmic pricing system. By capitalizing on Ritchie Brothers' existing global reach and asset-management expertise, Rouse could offer equipment rental companies more comprehensive solutions and thus become more powerful and ubiquitous.

52.    Ritchie Brothers also benefited from gaining access to clients' CSI collected through Rouse Service. As stated by Sam Wyant, Ritchie Brothers' president of international sales, Rouse Service helped Ritchie Brothers to "diversif[y] its offering for its clients, including "providing customers with insightful data on fleet performance, operational costs, optimal fleet utilization and

---

[12] https://www.equipmentworld.com/dealers/article/14965400/hertz-equipment-rentals-is-now-herc-rentals-following-spin-off
[13] https://www.rouseservices.com/solutions/rental-insights/

more."[14] Upon completion of acquisition of Rouse Service, Ann Fandozzi, CEO of Ritchie Brothers highlighted the benefit of collecting and sharing clients' data through Rouse Service: "Rouse offers a complementary tool kit to what we offer at Ritchie Bros. today. Together, we believe we can accelerate both of our growth efforts by providing customers more robust data, better service and innovative solutions to help their businesses run more efficiently. At Ritchie Bros. today, we are more than auctions."[15]

53.     By 2024, over 400 rental equipment companies across North America used Rouse Service. This includes all 10 of the top 10 rental companies, and 70 of the top 100, as measured by RER. Rouse Service has stated that its database covers at least 60% of the North American rental equipment market, meaning market participants covering more than 60% of the entire industry use Rouse Service and contribute their CSI to Rouse Service.

**B.     Rouse Service and the Equipment Rental Company Defendants Conspired to Eliminate Competition by Outsourcing Independent Pricing Decisions to Rouse Rental Insight.**

54.     Construction equipment rental is a significant segment of the construction industry in the U.S. This is largely due to demand for machinery and equipment without the upfront capital investment.

55.     Construction equipment may be used in residential, commercial, and industrial sectors, and includes, but is not limited to lifts, dozers, excavators, hoes,

---

[14] https://www.internationalrentalnews.com/news/interview-ritchie-bros-exec-looks-at-used-equipment-markets-and-more/8033885.article
[15] https://www.monitordaily.com/news-posts/ritchie-bros-completes-acquisition-of-rouse-services/

steers, compaction equipment, cranes, and loaders. "Construction equipment" is ordinarily used in the industry to refer to large, heavy equipment and components of such equipment, rather than smaller tools.

56.    Equipment rental companies purchase approximately one-third of all construction equipment sold in North America. Individuals and entities often rent rather than purchase the equipment they need for construction projects because renting is usually more affordable, especially for smaller companies or for projects that require equipment for a short period of time. Buying equipment necessitates a significant up-front investment, as well as ongoing storage and maintenance costs, while renting requires paying a reduced price only during the duration the equipment is used, freeing up capital for other needs.

57.    Before Rouse Service became ubiquitous in the industry, equipment rental companies used cost and demand driven factors to independently determine construction equipment rental pricing.

58.    Rental companies, including the Equipment Rental Company Defendants, traditionally set prices by calculating the costs of owning and operating equipment, including purchase price, maintenance, and insurance, and then adding a markup for profit. This markup could vary depending on the type of equipment, but it was typically a standard percentage applied across all rental items. Equipment rental companies would also take inventory and demand into account.

59.    Pricing models generally were simple, with fixed daily, weekly, and monthly rental rates. Daily rates were the highest, while weekly and monthly rates offered discounts for longer rental periods. Without knowing their competitors' pricing strategies, equipment rental companies usually need to make a judgment call

and set their prices within a range that optimizes their competitive position in attracting customers. In other words, without collusion, a company could not unilaterally raise their rental rates above market rates because doing so would result in losing customers to competitors who offered market rates.

60.    With Rouse Service, competition is avoided by allowing equipment rental companies to share their most sensitive business information and set higher prices across the industry.

61.    Defendants United Rentals, HERC, and H&E have been involved in Rouse Service's rental pricing since its founding. In 2010, a former HERC President and the "Iconic Father of the Modern Rental Industry" described the "pricing pain that is being felt throughout the equipment rental industry" as being "largely self-inflicted." He called for the entire industry to implement "proper rate management" to stop the fierce competition in pricing and to show "leadership on rates." He specifically noted that "there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management. . . . Right now, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.".

62.    Rouse Service and participants in Defendants' conspiracy answered this call for "proper rate management" and "genuine discipline to rate management" in the market. As an example, Gary McCardle, a past executive at Rouse, complimented on how conveniently companies could use Rouse Service to fix prices: "It's one thing to tell your managers and sales staff they need to bring their rates up, but quite another to tell them with certainty they are 12-percent below

average for the market in generators, 14-percent below market average in mid-sized skid-steer loaders, and 17-percent below market average in 19-foot scissorlifts and tell them the exact amount of the average rate."[16] He further explained how Rouse Service encourages companies to implement price adjustments:

> So at any moment, if a rental company wants to know how it is doing with 19-foot scissorlifts in Birmingham compared to the competition, or air compressors in Memphis or any piece of equipment in any covered market for any time period, all it takes is a few keystrokes. A company can, also with a few keystrokes, determine how it is faring in physical or dollar utilization, rates, or fleet age compared to its competitors in markets covered by Rouse. It can also determine how it is faring in ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus its competition.

> One of the most popular ways to measure performance is ***to fuse revenue and physical utilization together on a trend line*** for a particular cat class over a period of some months. As a company brings its rates up in a particular market and sees physical utilization is below benchmark, it can concentrate on raising that physical utilization to match the increase in rental rates.

> Another analysis the RMBS makes is taking a look at what are the highest rates a company is getting in a particular market with its best contracts and what are its lowest. For example, the Rouse team showed a graphic where a rental company's lowest rates on a high-reach forklift in a particular market were nearly 10-percent lower than the lowest rates of any of its competitors. So this rental company had to come to grips with the fact that it was introducing lower rates for that product than any of its competitors in that market, something its management didn't even know it was doing. At the same time, the highest rates it was getting in that category were about 10-percent less than what its competitors were getting from its highest-paying customers. ***So the rental company could really see the adjustments it needed to make in that market.***

---

[16] https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service

63.     After Rouse went live with in 2011, it invited additional construction equipment rental companies—including Defendants Sunstate and Sunbelt—to join the scheme and begin sharing their CSI. As evidenced by Rouse Service's own advertisement from 2020, its pricing software Rouse Analytics facilitates pricing collusion by providing customers with real-time access to competitors' nonpublic data, including "actual rental invoices and daily fleet snapshots," which enables its customers to coordinate their rates and maximize their profitability:

> Making critical decisions about rental rates and fleet management can be risky when you rely solely on limited data and anecdotal information from your customers and sales reps. They can't help you see the complete picture and understand what is happening in the market, but we can. We're Rouse Analytics and we use actual rental invoices and daily fleet snapshots to provide rental business managers with the most accurate benchmark data available on rental rates and utilization by product and market. Easy to set up and simple to use. Our actionable intelligence is based on nightly fleet snapshots for over $45B worth of equipment and $20B in rental revenue. Our online portal is intuitive and designed for speedy analysis. And with automatic alerts and email notifications, it works for you even when you are not actively using it. . . . When you sign up with Rouse Analytics, we give you a 60 day free benchmark trial with access to all available subscription and benchmark reporting, including detailed local market level rate comparisons by product. . . . Contact us now to schedule a demo!

64.     On information and belief, Rouse has entered into similar contracts with hundreds of construction equipment rental companies, including each of the Equipment Rental Company Defendants. These agreements all expressly contemplate that the rental company will (1) share CSI with its rivals through Rouse; (2) have access to Rouse Service's database and Rouse' "benchmark" Pricing, which pools CSI from rivals; and (3) use Rouse's "benchmark" Pricing to set their own prices. These agreements directly evidence the conspiracy alleged herein.

65.    On information and belief, Equipment Rental Company Defendants and their co-conspirators further demonstrate their acceptance of Rouse Service's invitation to collude by tracking and rewarding their sales representatives who comply with Rouse Service's "benchmark" price. Discovery will reveal the identities and roles of all relevant participants.

66.    To attract new customers to join the conspiracy (and ensure the ongoing participation of existing members), Rouse Service regularly announces how many rental companies are part of its scheme. Rouse Service uses this as an "enticement" to get new clients interested in its algorithmic pricing tool. Such marketing contemplates and invites concerted action among rental companies to fix and increase prices.

67.    Defendants know that increased profits for the entire industry and successful price setting are only possible if there is a collective shift towards participation in the conspiracy. Construction equipment rental companies use Rouse Service only because they know that (1) their competitors and the largest companies in the market are doing the same, and (2) only through coordination with their competitors can they raise rental prices to supracompetitive levels without losing customers or sustain other corresponding competitive harms.

68.    The Equipment Rental Company Defendants and their co-conspirators accepted Rouse Service's advertised invitation to trade their CSI for the ability to charge artificially inflated equipment rental rates without fear of being undercut by their competitors. According to Rouse Service, over 400 of the nation's equipment rental companies have accepted its invitation to participate in concerted action to artificially inflate the equipment rental prices across the market.

69.    Market participants agreed that Rouse Service has "essentially standardized a lot of the price competition in the industry" and "since their involvement, rate[s] have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices."[17] Defendants' concerted action effectively eliminates the pricing strategy characteristic of a competitive construction equipment rental market.

70.    Equipment Rental Company Defendants and their co-conspirators also demonstrate their acceptance of Rouse Service's invitation to participate in the conspiracy by adhering to Rouse Service's "benchmark" determinations.

71.    Rouse and the Rental Company Defendants have admitted publicly to the existence of the alleged conspiracy among rental equipment companies to fix and increase prices for rental construction equipment through Rouse. For instance, Rouse Service advertises that its pricing information is based on data from over 400 companies, representing over $115 billion of fleet value and $49 billion of rental revenue. Rouse Service highlights that this data is made up of "actual real rental invoices sent to customers—not quoted or list rates," which enables companies to make the "most profitable decisions" possible. According to Rouse Service, it offers the only system that enables this level of accuracy in "benchmarking" in the equipment rental industry. Rouse claims to be the "[e]xclusive [s]ource for [b]enchmark [r]ate and [u]tilization [d]ata" for the industry. In 2024, Rouse bragged that 74 of the RER top 100 companies used Rouse to "make better business decisions" and "maximize their return on assets."

---

[17] https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition

72.    A November 22, 2024 podcast interview with Brad Spitzer, Director of Client Services at Rouse Service, including the following exchange: "Q: It's impressive when you say that you have the data of all, not some, but all of the national rental companies. . . . A: I think it helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better decisions. And then also help train their salespeople to you know not always listen to their customers and listen to the data and the market around them."

73.    Rouse has historic relationships with the ARA and the RER and uses those relationships to extend its public outreach and advertising. Rouse Service also appears regularly at industry conferences, advertising that its tools increase revenue and improve efficiency.

74.    Many Employees and executives of Defendants and co-conspirators have publicly praised the fact that Rouse Service liberates them from the traditional and legal forms of competition found in a competitive market and allows them to raise prices. In other words, by agreeing to implement and abide by a single, common pricing algorithm that incorporates shared competitively sensitive information provided by Defendants and co-conspirators, Rouse Service provides the Equipment Rental Company Defendants with the confidence, or "discipline," to inflate equipment rental rates without fearing such pricing strategy would be undercut by competitors. For example:

- The CFO of HERC stated in May 2023 that Rouse Service was "invaluable" for creating "discipline in the overall marketplace in the industry."

- A former CEO of a construction equipment rental company that was acquired by Sunbelt stated: "Rouse provide[s] them [the largest equipment rental companies] with a safety net when their sales reps claim that prices are falling." He went on to say that: "Both United and Sunbelt have consistently led in saying, 'We're going to raise prices, we're going to get prices higher."

- Ashtead Group Chief Executive Brendan Horgan stated: "Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years. This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years."[18]

- At a September 2024 Morgan Stanley conference, United CEO Matthew Flannery made a similar admission: "The industry is so much more disciplined . . . . Rouse analytics has been part of it. We have data now that helps."

75.    Rouse's private statements to rental companies also confirm that concerted action is the point of its business model. As described above, not only does Rouse Service collect CSI from all its equipment rental company clients, it also acts as a go-between for its clients, explicitly telling them who else is part of the conspiracy and which pricing/utilization strategies they are employing, all so that

---

[18] https://equipmentfinancenews.com/news/rentals/sunbelt-rental-revenue-rises-amid-persistent-large-rental-activity/

Rouse Service can facilitate and ensure each company to implement similar strategies and moves.

76.    Rouse Service also engages in ongoing marketing efforts and training with its clients, including the Equipment Rental Company Defendants, on a regular basis. Discovery will reveal the individuals that were involved in the marketing effort and the methods by which they trained their clients to implement Rouse Service's "benchmark" pricing.

**C.    Rouse Service Collects Extensive Data From Construction Equipment Rental Companies to Facilitate Sharing Of CSI And Enforcing the "Benchmark" Prices**

77.    As shown above, Rouse Service's "benchmark" pricing has become ubiquitous within the construction equipment rentals industry. To create the "benchmark" price, Rouse requires its clients to agree to submit every line item of every invoice they charge their customers every day, along with real-time utilization information on their entire fleet. Rouse Service interfaces with the Rental Company Defendants' software to automatically collect actual rental invoices and real-time inventory data on a daily basis, ensuring that data is constantly up-to-date and never stale.

78.    Rental invoices reflect CSI including utilization, fleet age and value, duration terms, and, most importantly, pricing, all of which is all non-public information. Discovery will reveal how Rouse Service uses the collected CSI to inform its algorithmic pricing tool to calculate common "benchmark" prices, which it then shared with and enforced upon the Equipment Rental Company Defendants and their co-conspirators.

79.     Rouse Service offers its "benchmark" prices by "Cat Class" (i.e., category and class of equipment) and specific to the client's local market. Rouse Service also provides information on where a company's rental rates stand in relation to its competitors on monthly, weekly, and daily rates. In setting rental rates, Rouse Service considers granular details of CSI, such as the precise age of a piece of equipment. Rouse Service also provides clients with "benchmarks" in "ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus [their] competition."

80.     The "benchmark" prices are continuously updated, as new CSI flows into Rouse Service. Rouse Service's customers are also shown where their prices measure up to the "benchmark" prices. In addition to the "benchmark" prices, Rouse Service provides mechanisms to facilitate and enforce implementation of the "benchmark" prices, thus maximizing compliance and thereby profitability for Defendants and co-conspirators.

81.     Rouse Service also provides reporting on which salespeople at the Equipment Rental Company Defendants are failing to meet Rouse Service's pricing. Rouse Service trains and encourages its clients to utilize this individual salesperson reporting and other methods to ensure that the "benchmark" prices hold. Here is an example of the type of individual salespeople reports offered by Rouse:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   82.    Customers also interact with Rouse Service to ensure that the

18  "benchmark" prices are being followed. Rouse Service's "business analysts"

19  manage customer relationships, answering questions about using the "benchmark"

20  prices to improve profitability. Rouse Service also assists clients with implementing

21  and updating Rouse Service's software.

22   **D.    Defendants' Conduct Has No Pro-Competitive Benefits And Only**

23          **Benefitted Themselves**

24

25   83.    Defendants' scheme has not benefited competition. It has also not had

26  pro-competitive effects in the construction equipment rental market. Instead,

27  Defendants conduct has had the effect of benefiting them by increasing revenues

28

and profits; meanwhile, Plaintiff and class members they seek to represent have subsidized this misconduct by paying artificially inflated prices for their rental equipment.

84.    While Defendants' misconduct may have increased their operational efficiencies (e.g., by saving costs, time, or other resources associated with traditional methods of fair pricing), yet such efficiency gains did not lead to lower prices. Instead, as discussed below, the "benchmark" prices and Defendants' prices increased over time, suggesting that any efficiency gain was not passed on to downstream customers. Moreover, it has meanwhile made it more time-consuming and difficult for Plaintiff and class members to identify and secure meaningfully less expensive rental rates for comparable construction equipment.

85.    Assuming any procompetitive benefits from Defendants' misconduct exist, they would be minimal in nature and could not outweigh the substantial and anticompetitive effects of this misconduct.

86.    The use of Rouse Service has had a transformative impact on the construction equipment rental market. As industry participants—including Rouse Service and the Equipment Rental Company Defendants— admit, the "benchmark" prices has caused anticompetitive effects in the form of higher prices and reduced output.

87.     Rouse advertises that its services help rental companies raise prices and improve profitability. An example of such an advertisement is below:



*Excerpt from Rouse ad in the March 2015 issue of International Rental News*

88.     As equipment rental companies have aligned their prices with the coordinated prices provided by Rouse Service, prices across the industry have converged, reducing the natural variability of pricing. This stifles competitive pricing strategies and limits differentiation among rental companies.

89.     As the CFO of HERC stated in May 2023: "You have sort of 50% to 60% of North American rental companies reporting into Rouse . . . . And that certainly goes to the discipline in the overall marketplace in the industry . . . . I think it's invaluable." In 2022, 93% of respondents to an ARA rental industry survey said that they had increased their rates that year.

90.     The use of Rouse Service's "benchmark" prices suppresses competition by encouraging equipment rental companies to follow a common pricing structure, rather than setting rates based on their own specific market conditions, customer base, or operational costs. This prevents equipment rental

companies from undercutting or aggressively pricing their equipment in ways that would typically foster competition, resulting in artificially high prices.

91.    Defendants and their co-conspirators are reporting record profits in recent years, thanks to the conspiracy they joined. Rouse Service reported that the revenue of the top 10 companies on the RER—all of whom are Rouse Service's customers—rose by almost $5 billion dollars from 2022 to 2023.  As one example, United Rentals' revenue increased 7.1% from 2023 to 2024.

92.    Like United Rentals, Sunbelt Rentals has also seen substantial profit growth in recent years and has acknowledged the role of "rate discipline" in its success.

93.    HERC Rentals' revenue from its equipment rental segment grew 46% between 2021 and 2023.

94.    The graphic below shows the rapid growth in revenue in the market.



Source: S&P Global Market Intelligence, ARA Rentalytics

95.     Rouse Service was able to help companies achieve these record profits despite simultaneous reductions in output. For instance, during the economic downturn caused by COVID-19, industry analysts were surprised to see that the equipment rental sector (unlike equipment retail, and the construction industry generally) continued to thrive.

96.     In the years since 2020, major equipment rental companies have managed to maintain their elevated rates even through supply ebbs. On earnings calls, executives explained that the industry had been transformed by data and "discipline." They stated that after the wide adoption of Rouse Service's "benchmark" prices, national rental companies like the Equipment Rental Company Defendants "were willing, at least in the short term, to endure lower time utilization rather than go too low on dollar utilization." Industry executives also talked about "time utilization being down, but their rate being up," which "wouldn't have happened 15 years ago" before the Rouse Cartel was formed.

97.     At a Bank of America conference in May 2022, CEO of Defendant HERC, Lawrence Silber, was asked by an analyst, "What gives you confidence and the ability to kind of normalize at these higher levels versus kind of seeing the fall that you might have seen in the past?" He responded in part, "The difference between a company today and what it was maybe 10 years ago or even five years ago is we're technology enabled. We're really at the forefront and leadership level of having all the equipment be telematically enabled . . . . In fact Rouse Analytics, which is a key tool that we use to help us price in the marketplace, helps us manage a level of fleet that's in the market, understand what competition – it has over 60% of the market participating, now putting data into that."

E.    **Studies Show That Industry-Wide Usage of a Shared Pricing
Algorithm Leads to Anticompetitive Effects.**

98.    Extensive economic research documents that the use of pricing
algorithms leads to anticompetitive effects, including elevated prices. Modern
algorithms can use artificial intelligence to reach the objective of maximizing profits
without the need for human intervention. Indeed, legal scholars, economists, and
antitrust regulators studying this issue have all concluded that competitors' use of a
shared pricing algorithm to set prices produces the same types of anticompetitive
effects alleged here.

99.    In a May 2017 paper, "Algorithmic Collusion: Problems and Counter-
Measures," competition law professors Ariel Ezrachi and Maurice Stucke discuss
"how in an online environment a hub-and-spoke [price-fixing conspiracy]
framework may emerge when sellers use the same algorithm or the same data pool
to determine price." In particular they state that:

> An industry-wide use of a single algorithm, which competitors use to
> determine the market price or react to market changes, would result in
> de-facto hub-and-spoke structure, as the market behavior of the
> competitors aligns due to the use of a similar "brain" to determine their
> price strategy. These effects intensify when sellers use the same data
> pool and are privy to vast volumes of data. Huband spoke structures may
> therefore be observed at the input level (data) and the output level
> (algorithm).[19]

100.    Ezrachi and Stuck note this situation playing out in connection with gas
stations using the same third-party analytics provider to determine fuel prices. The

[19] Ariel Ezrachi and Maurice Stucke, Algorithmic Collusion: Problems and
Counter-Measures, at 10, Roundtable on Algorithms and Collusion (June 2017),
available at
https://one.oecd.org/document/DAF/COMP/WD%282017%2925/en/pdf.

professors conclude that "[t]his anecdotal example supports the assertion that as competitors use a single hub – a single provider for algorithmic pricing – one may expect, in markets susceptible to tacit collusion, greater alignment of pricing decisions and higher prices overall."

101.    Consistent with this, a growing body of academic research documents that algorithms make it easier for competitors to coordinate on pricing and charge supracompetitive prices. For example, an experimental study published in the American Economic Review found that competing firms, using AI powered algorithmic pricing, would settle, over time, into an equilibrium model where each firm charged supracompetitive prices.[20] The result was robust to asymmetries in cost or demand, or changes in the numbers of players.

102.    Similarly, a 2021 empirical study found (in line with the predictions of theoretical models, and with Ezrachi and Stucke's predictions) that when gas stations in Germany used algorithms to set prices, their margins increased by approximately 9%. Critically, the authors found that algorithm use only raised prices above competitive levels in places where competitors adopted algorithms jointly, and thus that "algorithmic pricing software adoption raises margins *only through its effects on competition*"; by contrast, in areas where (1) a station had no competitors or (2) there were two stations but only one adopted algorithmic pricing, the authors found "no change in mean margins or pricing."[21] In other words, algorithm use

---

[20] Emilio Calvano et al., Artificial Intelligence, Algorithmic Pricing and Collusion, 110 AM. ECON. REV. 3267-97 (Oct. 2020), https://www.aeaweb.org/articles?id=10.1257/aer.20190623.

[21] See Stephanie Assad et al., Autonomous algorithmic collusion: Economic research and policy implications at 15, Toulouse School of Economics Working Paper (Mar. 2021), available at https://www.tse-

among these stations raised prices not by driving efficiency or achieving some

procompetitive result, but instead by undermining normal market competition. The

authors also note:

> Algorithmic pricing can also affect competition if a single intermediary
> software provider sells their product to multiple competitors. Such
> adoption could lead to hub-and-spoke(where the provider acts as the hub
> of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with
> competitors coordinating to higher prices by delegating choices or
> relaying information to the same third party. These concerns are
> warranted by the statements and observed behaviour of software
> providers. Some providers promote their products by suggesting that
> they optimize for long-term revenues and avoid price wars.[22]

103.   Uber also sets prices algorithmically, which users recognize in now-

regular occurrences of "surge pricing" where prices spike (often to eyewatering

levels) at times of high demand. This algorithmic pricing leads to higher prices for

customers and higher revenue for Uber, even though Uber's costs do not change

significantly during the surge pricing periods. As one academic has noted, even

though drivers are theoretically independent contractors who could compete against

each other, each driver has "agreed to have their prices coordinated and set by the

algorithm." This could constitute, as the author puts it, a "twenty-first-

century[]techno-cartel."[23] Areeda and Hovenkamp also state that a "practice of

---

fr.eu/sites/default/files/TSE/documents/doc/wp/2021/wp_tse_1210.pdf (emphasis
added).

[22] *Id.* at 4.

[23] Salil K. Mehra, Antitrust and the Robo-Seller: Competition in the Time of
Algorithms,100 MINN. L. REV. 1323-75 (2015).

interseller price verification . . . would appear to be a naked or at least a nearly naked restraint" in violation of antitrust law.[24]

104.    Government regulators around the world have also expressed concerns about algorithmic pricing's effect on competition. For example, former Acting Assistant Attorney General of the Antitrust Division for the Department of Justice in 2023 stated: "Where competitors adopt the same pricing algorithms, our concern is only heightened. Several studies have shown that these algorithms can lead to tacit or express collusion in the marketplace, potentially resulting in higher prices, or at a minimum, a softening of competition."[25]

105.    Similarly, while serving as acting chairman of the Federal Trade Commission, Maureen Ohlhausen explained in 2017 how multiple firms outsourcing pricing decisions to a single third-party actor raises significant antitrust concerns, and asked rhetorically: "Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either." Ohlhausen emphasized: "this is fairly familiar territory for antitrust lawyers, and we even have an old fashioned term for it, the hub-and-spoke conspiracy. Just as the antitrust laws do not allow competitors to exchange competitively sensitive information directly in an

---

[24] Herbert Hovenkamp & Phillip E. Areeda, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2113 (4th and 5th Ed. 2018-2022).

[25] U.S. Dep't of Justice, Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023 (Feb. 2, 2023), available at https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-generaldoha-mekki-antitrust-division-delivers-0.

effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information."[26]

106.   Rouse Service here plays exactly the role of "a guy named Bob." It collects CSI from each of the Equipment Rental Company Defendants, and then tells them, through the use of its algorithm, how to price their construction rental equipment.

**F.    Parallel Conduct And "Plus Factors" Indicate an Existence of a Price-Fixing Conspiracy.**

107.   As set forth in detail above, Defendants engaged in multiple forms of parallel conduct including (1) entering into agreements to use Rouse Service and Rouse Service's "benchmark" prices during the same periods of time; (2) providing each Defendant's own competitive sensitive information to Rouse Service; (3) using Rouse Service's "benchmark" prices with the understanding that usage would produce artificially inflated prices; and (4) implementing prices increases after beginning their usage of Rouse Service.

108.   In addition, the construction equipment rental market has numerous "plus factors" that render the industry susceptible to collusion and tend to exclude the possibility of independent action. These "plus factors" include (1) exchanges of competitively sensitive information among horizontal competitors, (2) actions against economic self-interest, (3) high barriers to entry, (4) high switching costs,

---

[26] Maureen K. Ohlhausen, Should We Fear The Things That Go Beep In the Night? Some Initial thoughts on the Intersection of Antitrust law and Algorithmic Pricing, Federal Trade Commission (May 23, 2017),
https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf.

(5) relative fungible products subject to inelastic consumer demand; (6) market concentration and (7) ample opportunities to collude.

### 1.    Exchange of Competitive Sensitive Information

109.    As alleged above, the Equipment Rental Company Defendants all agreed to submit their CSI to Rouse Service with the knowledge that Rouse Service would use that data to calculate equipment rental rates for their competitors. Such an agreement of mutual sharing CSI by the Equipment Rental Company Defendants is against each Defendant's unilateral self-interest but for the existence of a conspiracy. This is because even though it may be in a firm's unilateral self-interest to receive competitive sensitive information from its competitors, it would be against its self-interest to share such information since competitors can use such information to undercut its prices or take its market share but for the existence of a conspiracy.

110.    Moreover, CSI shared through Rouse Service, even if aggregated across participants, can assist monitoring and enforcement adherence to an agreement. A cartel member is easily tempted to increase its sales by undercutting its co-conspirators, and cartels generally attempt to detect such deviations from an agreement and thereby incentivize its members to comply. Without any industry or market data, firms that did not cheat on their co-conspirators would see their own sales and profitability decline. While they may suspect cheating, their lack of market information would prevent them from ascertaining that cheating had occurred, as well as determining which of their rivals cheated.

111.    With access to aggregate market data, firms could discern whether industrywide output increased, or whether average price decreased. If output

increased and prices decreased, it would indicate that some cartel member(s) had not complied with the agreed-upon supply restrictions. Consequently, there could be a punishment in the form of a temporary expansion of supply by cartel members that would result in lower prices and lower profits. The anticipation of that punishment would help incentivize firms to comply with the coordinated supply reductions. Of course, these temporary price wars are costly to the cartel but serve to maintain cartel stability.

112.    When Rouse introduced its rental pricing service in 2011, it had five participants. Today, it boasts over 400 members. From 2019 to 2024, its membership grew 150%. The ubiquitous implementation of Rouse Service's "benchmark" prices provide confidence to the Equipment Rental Company Defendants that the sharing of CSI do not harm their business but benefit them, which is evidenced by their continued growth of revenue and the elevated level of the equipment rental rates.

## 2.    Actions Against Economic Self-Interest

113.    As part of the Rouse Cartel, each Rental Company Defendant (who are horizontal competitors to each other) engages in actions that, in the absence of concerted action, would be against its individual economic self-interest, but that, in the context of the scheme, maximize collective profits. These "actions against self-interest" are strong circumstantial evidence of a horizontal agreement to fix prices.

114.    First, it is against the unilateral economic interest of any individual rental company to share its CSI with other rental companies through a common third party unless each Rental Company Defendant knew that all competitors had agreed to do the same. In the absence of an agreement to conspire, companies would not

share this information because competitors could use it to make lower bids and seize market share.

115.   Professors Kovacic, Marshall, Marx, and White describe some of the conditions under which communications among rivals constitute a plus factor indicating actions against firms' unilateral self-interests in the absence of an agreement:

> Overall, information is a valuable commodity. For one seller to know information about a rival is to give that seller a competitive advantage. A competitor has no unilateral interest in disadvantaging itself relative to its rivals.

> Suppose one seller knows the customers who purchased from another seller in the past quarter and knows the price and quantity of each transaction with each customer during the past quarter. The receiver will argue that it wants to know these things in a competitive marketplace and that it cannot be expected to ignore such information when it comes to its attention. However, why would the sender convey such information? Sloppiness and incompetence in the management of critical business information are not legitimate reasons. The sender may argue that it did not convey the information, but rather that each buyer gave this information to the receiver. But how would a buyer gain by conveying information to a nonawardee about the terms offered by an awardee? In the absence of direct evidence that such conveyances were made, it is reasonable to assume that the sender transmitted the information to the receiver. But the sender would have no unilateral self-interest in doing so. Thus, the motivation must be explicit collusion, and there must be an expectation of reciprocation.

> With regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process. The conveyance of firm-specific production and sales information is important for monitoring compliance with many cartel agreements. For example, market share allocations require knowledge of exactly this kind of information, as well as the ability of cartel members to verify such information.

Sometimes cartels will use trade associations, export associations, or outside consultants to convey this information among themselves.[27]

116. Second, it is against Equipment Rental Company Defendants' economic self-interest to continually increase rental rates without negotiating or offering discounts. In the absence of collusion, rental companies would offer competitive rates to achieve greater customer satisfaction and avoid losing business and market share. The conspiracy enables companies to avoid this type of price erosion.

117. Third, it is against the economic self-interest of Rental Company Defendants to increase rates while keeping utilization rates steady or even lowering them. Raising rental rates while simultaneously reducing utilization rates is an action against self-interest if undertaken unilaterally, because it would ordinarily cause an erosion of that rental company's market share.

### 3. High Barriers to Entry

118. As noted above, establishing a business that rents construction equipment requires substantial capital and clearing a variety of other significant entry barriers including, for example, developing a customer base. Thus, new entrants into the construction equipment rental market are unlikely to discipline cartel pricing.

---

[27] Kovacic, W., Marshall, R., Marx, L., and White, H. (2011), "Plus Factors and Agreement in Antitrust Law," *Michigan Law Review*, vol. 110, pp. 393-436, at 423-24. *See also* Marshall, R. and Marx, L. (2012), *The Economics of Collusion*, MIT Press, Ch. 11. *See also*, Delegation of the United States to the Competition Committee (2010), "Roundtable on Information Exchanges Between Competitors," in OECD, "Information Exchanges Between Competitors under Competition Law," *available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf

### 4.    High Switching Cost

119.   Companies that rent construction equipment face high exit barriers. Renters, such as Plaintiff, would incur substantial costs switching equipment providers mid-project, and where price escalation is occurring, they might not have a lower priced option in reasonable proximity to their current project. As such, renters like Plaintiff cannot easily turn to alternatives to the rental companies in the conspiracy to discipline cartel pricing.

### 5.    Relative Fungible Products Subject to Inelastic Consumer Demand

120.   Construction equipment is relatively fungible. One 2020 Caterpillar bulldozer is largely the same as another. Rental company customers rarely have any additional information that would distinguish one piece of equipment from another when making spending decisions. This fungibility is what enables Rouse Service to present its pricing by "Cat Class."

121.   The demand for rentals of construction equipment is relatively inelastic. The only realistic alternative to renting is buying, and as explained previously, that is not a financially feasible option for most contractors. Thus, no reasonable substitutes exist to discipline cartel pricing.

### 6.    Market Concentration

122.   The market for construction equipment rentals is highly concentrated. in 2023, the Rental Firm Defendants made up over 80% of the market in terms of revenue. Rouse Service's executives have stated that rental companies using the "benchmark" prices collectively possess at least 60% of the North American

construction equipment rental market. A conspiracy is easier to effectuate, maintain, and enforce in a concentrated industry.

### 7.    Ample Opportunities to Collude

123.   Rouse Service and participating equipment rental companies have had ample opportunities to collude. Rouse Service regularly sponsors industry conferences. Recently, a VP at Rouse Rental Insights was on a panel called "Leveraging Data and Technology to Increase Revenue and Improve Efficiency." At that conference, Rouse Service said that its pricing tool "enables equipment rental companies to outperform competitors by optimizing fleet management, pricing strategies, and maintenance processes."

124.   Finally, industry trade associations offer Rouse and participating rental companies additional opportunities to conspire. For example, Rouse and the Equipment Rental Company Defendants are all members of the ARA, which offers training, consumer research, and myriad networking opportunities. There are several other trade associations and groups that the Rental Company Defendants, Ritchie Bros., and Rouse participate in.

## V. RELEVANT MARKET

125.   Defendants' actions described herein constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain the construction equipment rental prices at artificially high levels, and is *per se* illegal under the Sherman Act. The purpose of Defendants' arrangement (which Rouse Service orchestrates) is to facilitate coordination between horizontal competitors, including the Equipment Rental Company Defendants, to fix and raise the prices of construction rental equipment. This agreement was evidenced by the Equipment Rental Company

Defendants' reciprocal exchange of competitively sensitive information through Rouse Service and outsourced their independent price decisions to a common decision maker.

126.   Because of the horizontal nature of the alleged conspiracy, and because the conduct alleged here increased prices and reduced output, if the Court declines to analyze this case under the per se rule, the Court could conduct a "quick look" review. Under either mode of analysis, Plaintiff is not required to prove that Defendants had market power in any defined antitrust market. To the extent the Court decides to engage in the rule of reason analysis, the relevant product market is the construction equipment rental market, and the relevant geographic market is the United States.

127.   There are no economic substitutes for renting construction equipment. Companies cannot simply purchase the necessary equipment in lieu of renting, given the enormous capital outlay required to purchase a single piece of construction equipment. Further, construction projects require multiple diverse pieces of construction equipment. Renting provides companies the flexibility to access different types of equipment that they might need for their projects while avoiding the expense and logistics of buying and housing a varied fleet. Even a small amount of construction equipment would require monetary outlays of millions of dollars to acquire. Renting also allows companies to access newer, more up to date equipment models instead of using dated equipment from the time of an initial purchase.

128.   Additionally, rental companies typically handle maintenance and repairs, which is a significant cost incurred by construction companies that own their equipment. Construction equipment rental payments are often considered tax-

deductible operating expenses, which can potentially reduce a construction company's tax liabilities. Contractors can also avoid the costs associated equipment depreciation, which can be substantial for expensive construction equipment. By renting rather than purchasing, contractors can also avoid taking out long-term and costly insurance policies to ensure the equipment against theft or damage because the rental companies typically handle that. Finally, renting equipment allows customers to avoid size- intensive and costly storage.

## VI.  DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

129.   To the extent proof of market power is needed under a rule of reason analysis, Defendants and co-conspirators' collective power can be established through direct evidence (e.g. their collective ability to control prices and profitably push them above competitive levels). To the extent necessary, Defendants and co-conspirators' collective power can also be established through indirect evidence, such as their collective share of the relevant market.

130.   Defendants and co-conspirators would not have been able to profitably increase their pricing unless they collectively possessed market power over customers. Absent the conspiracy, equipment rental companies would face competitive harms for their supracompetitive prices making such behavior unprofitable.

131.   Rouse Service advertises that 74 of the RER Top 100, and all 10 of the top 10, use it to set their equipment rental prices. With the vast amount of equipment rental market controlled by companies that use Rouse Service, customers have no real alternatives in terms of the companies from whom they can rent equipment.

This is also direct evidence of Defendants and co-conspirators collective market power.

## VII.   ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

132.   Defendants' anticompetitive conduct had the following effects, among others: (a) competition among the Equipment Rental Company Defendants has been restrained with respect to their equipment rental prices; (b) the rental prices of construction equipment has been fixed, stabilized, or maintained at artificially high levels; and (c) renters of construction equipment, including Plaintiff and the Class, have been deprived of the benefit of free and open competition.

133.   The conspiracy directly damages Plaintiff's business and property and restrains competition in the relevant market. Plaintiff has sustained and continue to sustain economic losses—the full amount of which Plaintiff will calculate after discovery and prove at trial—due to Defendants' price-fixing conspiracy.

134.   But for Defendants' conspiracy, Plaintiff and members of the proposed Class would have paid less for construction equipment rentals. Paying inflated prices caused by an unlawful agreement is a quintessential antitrust injury.

135.   While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

136.   The antitrust laws aim to prevent injuries such as those alleged herein that stem from a conspiracy among sellers to systematically raise the price paid for a good or service, such as equipment rentals. Agreements to reduce price competition or fix prices violate the antitrust laws.

137.   By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S., and caused antitrust injury to Plaintiff and members of the proposed Class.

## VIII.  CLASS ACTION ALLEGATIONS

138.   Plaintiff bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

139.   The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

140.   Plaintiff's claims are typical of those of the Class because Plaintiff presses the same legal theories, and seeks to redress the same injury, for themselves as for all members of the proposed Class.

141.   Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent construction equipment than they otherwise would have in a competitive market.

142.   Plaintiff will fairly and adequately protect and represent the interests of the Class.

143.   Plaintiff's interests are not antagonistic to the Class.

144.   Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual class members,

because the Defendants have acted and refused to act on grounds generally applicable to the Class.

145.    Questions of law and fact common to the Class include:

a.  Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of construction equipment rentals from competitive levels;

b.  If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

c.  If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of construction equipment from competitive levels;

d.  The proper measure of damages; and

e.  The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

146.    Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

147.    Class action treatment is the superior method for the fair and efficient adjudication of controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## IX.    CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR

## AGREEMENT IN RESTRAINT OF TRADE (HUB AND SPOKE

## CONSPIRACY) 15 U.S.C. §1

**(On Behalf of Nationwide Class for Injunctive and Equitable Relief and
Compensatory Damages)**

148.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

149.    Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021 (further investigation and discovery may reveal an earlier date), Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

150.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to use Rouse Service's pricing algorithms to artificially inflate price in the nationwide market for construction equipment rental. This combination, generally known in antitrust law as a hub and spoke conspiracy, consists of a combination of (1) a set of vertical agreements between the Equipment Rental Company Defendants and Rouse Service that implement the "benchmark" prices (2) a horizontal agreement amongst all Defendants to use Rouse Service for collectively setting construction equipment rental prices and maximizing profits.

151.   The contract, combination, or conspiracy alleged herein has caused Plaintiff and Class members to suffer overcharge damages.

152.   There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

153.   Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under either a quick look or rule of reason analysis.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**FOR AGREEMENT IN RESTRAINT OF TRADE (SET OF VERTICAL**

**AGREEMENTS) 15 U.S.C. § 1**

**(On Behalf of Nationwide Class for Injunctive and**

**Equitable Relief and Compensatory Damages)**

154.   Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

155.   Plaintiff seeks monetary and injunctive relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

156.   Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting construction equipment to Plaintiff and the Class.

157.   Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021 (further investigation and discovery may reveal an earlier date),

Defendants and their co-conspirators entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

158.    Specifically, Defendants have formed a cartel to artificially inflate the price and/or decrease the supply of construction equipment rentals from competitive levels.

159.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

160.    Defendants have committed various acts in furtherance of this conspiracy, including, but not limited, to the following:

- Rouse Service created its "benchmark" pricing tool at the behest of Defendants United Rentals, HERC, and H&E;

- Rouse Service advertised and sold its pricing tool to additional rental companies as a means to raise prices and achieve greater profits;

- The Equipment Rental Company Defendants agreed to provide real-time, non-public, confidential, competitively sensitive, and detailed internal data to Rouse Service for use in Rouse Service's coordinated pricing;

- The Equipment Rental Company Defendants knowingly used the Rouse Service's price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

- The Equipment Rental Company Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and

- Rouse empowered the Equipment Rental Company Defendants to enforce the coordinated prices.

161.   The conspiracy has caused Plaintiff and the Class to suffer overcharge damages.

162.   There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

163.   The Defendants' cartel is unlawful under a *per se* mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

164.   As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and be deprived of the benefit of free and fair competition unless Defendants' conduct is enjoined.

165.   Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

166.   Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

## FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION

## 15 U.S.C. § 1

**(On Behalf of Nationwide Class for Injunctive and**

**Equitable Relief and Compensatory Damages)**

167.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    Beginning at a time currently unknown to Plaintiff, but at least as early as March 31, 2021 (further investigation and discovery may reveal an earlier date), Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and nonpublic information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

169.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

170.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for renting construction equipment.

171.    The relevant product market is the construction equipment rental market, and the relevant geographic market is nationwide.

172.    Defendants possess market power in the relevant antitrust market.

173.    Defendants could impose an increase in the price of rental rates collectively without causing many renters to switch their choice of rental equipment. Construction equipment rentals constitute a unique product market.

174. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current supply, utilization, and construction equipment rental rates.

175. Equipment Rental Company Defendants' regular information exchanges through Rouse Service reflected concerted action between horizontal competitors in the market for construction equipment rental. Equipment Rental Company Defendants understood that information they provided would be incorporated into Rouse Service's "benchmark" pricing tool and also used, in aggregated fashion, to provide pricing recommendations through the tool.

176. Each Equipment Rental Company Defendants furnished competitively sensitive information to other equipment rental companies with the understanding that it would be reciprocated in the form of pricing recommendations that utilized that data. These reciprocal exchanges of information between Equipment Rental Company Defendants constituted a horizontal exchange of information.

177. The collective agreement to regularly exchange detailed and non-public information about current supply, utilization, and equipment rental rates suppressed competition between the Equipment Rental Company Defendants.

178. When Equipment Rental Company Defendants that are competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Equipment Rental Company Defendants used the data obtained through Rouse Analytics to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the market. This strategic information was a material factor in

Defendants' decisions to inflate the prices that Plaintiff and Class members paid for construction equipment rental during the Class Period.

179.  Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

180.  The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the nationwide construction equipment rental market, and (2) inflating the prices of construction equipment rental during the Class Period.

181.  As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated prices for construction equipment rental. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for construction equipment rental than they would have paid and will pay in the absence of the conspiracy.

182.  This horizonal agreement to exchange information constitutes a violation of Section 1 of the Sherman Act under a rule of reason analysis.

## X. PETITION FOR RELIEF

183.  Plaintiff petitions for the following relief:
   a. A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be

appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

b. A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis;

c. A judgment enjoining Defendants from engaging in further unlawful conduct;

d. An award of attorneys' fees and costs;

e. An award of pre- and post-judgment interest on all amounts awarded; and

f. Such other relief as the Court deems just and equitable.

## XI.    JURY DEMAND

184.   Plaintiff requests a trial by jury of all issues so triable.

DATED: <u>May 23, 2025</u>                    Respectfully submitted,

By:   /s/Francis J. "Casey" Flynn, Jr.

Francis J. "Casey" Flynn, Jr., SBN 304712
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
5067 Metropolitan Plz.
Los Angeles, California 90036
Tele: 314-662-2836
Email: casey@lawofficeflynn.com

Michael J. Flannery (Cal Bar No. 196266)
**CUNEO GILBERT & LADUCA, LLP**
Two CityPlace Drive
Second Floor
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley (admitted *pro hac vice*)
Daniel M. Cohen (admitted *pro hac vice*)
Cody McCracken (admitted *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
2445 M St. NW
Suite 740
Washington, D.C. 20037

Tel: (202) 789-3960
Fax : (202) 789-1813
evelyn@cuneolaw.com
danielc@cuneolaw.com
cmccracken@cuneolaw.com

**Marco Cercone (admitted *pro hac vice*)**
**RUPP PFALZGRAF LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202
Tel: (716) 854-3400
cercone@rupppfalzgraf.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on <u>May 23, 2025</u>, I electronically filed the foregoing with the Clerk of the Court by using the e-filing system which will send notification of such filing to all attorneys of record.

<u>    /s/    Francis J. "Casey" Flynn, Jr.    </u>